UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DAVID LEE ANDERSON, | § | |
| | § | |
| Defendant-Movant, | § | |
| v. | § | CIVIL NO:  SA-17-CA-901-OG |
| | § | CRIMINAL NO:  SA-14-CR-0123-OLG |
| UNITED STATES OF AMERICA | § | |
| | § | |
| Plaintiff-Respondent. | § | |

## GOVERNMENT'S RESPONSE TO MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO TITLE 28 U.S.C. § 2255

Comes now the United States of America, by and through the United States Attorney for the Western District of Texas and the undersigned Assistant United States Attorney and files their response to Movant's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255.  The United States of America states that the motion should be denied and would respectfully show the Court as follows:

### PROCEDURAL BACKGROUND

On February 19, 2014, in the Western District of Texas, San Antonio Division, Movant David Lee Anderson (hereinafter "Anderson or Movant") was charged with numerous drug trafficking and weapons charges.  Appellant was charged in counts one through eight and in count ten with the offenses of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846 (count one); possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and § 841 (b)(1)(B) (count two); possession of a firearm or ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (count three); possession with intent to distribute

methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and § 841 (b)(1)(A) (count four);

aiding and abetting the possession with intent to distribute methamphetamine, in

violation of 21 U.S.C. §§ 841(a)(1)( and 841(b)(1)(B) and 18 U.S.C. § 2 (count five);

possession with intent to distribute methamphetamine, in violation of 21 U.S.C.

§§841(a)(1) and 841 (b)(1)(A) (count six); possession of a firearm or ammunition by a

convicted felon, in violation of 18 U.S.C. § 922(g)(1) (count seven); aiding and abetting

the possession with intent to distribute methamphetamine, in violation of 21 U.S.C.

§§841(a)(1) & 841 (b)(1)(B) and 18 U.S.C. § 2 (count eight); and aiding and abetting

possession with intent to distribute methamphetamine, in violation of 21 U.S.C.

§§841(a)(1) & 841 (b)(1)(C) and 18 U.S.C. § 2.

The government also gave to Movant and his codefendants notice of demand for

forfeiture of the government's intent to seek forfeiture of cash, cars, and weapons.  *See*

docket no. 29.  On April 7, 2015, a plea agreement was filed.  In the written plea

agreement, Anderson pled guilty to count one of the indictment, Conspiracy to Possess

with Intent to Distribute a mixture or substance containing 500 grams or more of a

detectable amount of methamphetamine, Schedule II Controlled Substance, in violation

of Title 21, United States Code, Sections 846 & 841(a)(1)/(b)(1)(A).  *See* plea

agreement, docket no. 144, p. 1.  On July 23, 2015, Anderson was sentenced to a term

of 293 months imprisonment, 10 years supervised release, and given a $100 special

assessment. *See* docket no. 162.

Anderson appealed his judgment and sentence on July 30, 2015, in a timely

manner.  Anderson argued that the 293-month imprisonment sentence was

unreasonable because it was greater than necessary to meet the sentencing goals set

out in, *inter alia*, 18 U.S.C. § 3553(a).  The appeal judgment was filed on July 19, 2016

and ordered dismissed[1].  Anderson now brings his motion for relief pursuant to Title 28,

United States Code, Section 2255.

## TIMELINESS

A one-year period of limitation applies to a § 2255 motion.  The limitation period

runs from the latest of:

1) the date on which the judgment of conviction becomes final;

2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

*See* Title 28 U.S.C. § 2255 (2016).  Anderson timely filed his § 2255 motion since it is

within the 90 days plus one year time period after the 5th Circuit Judgment was filed.

## PROCEDURAL BAR

Usually, after a conviction and exhaustion or waiver of any right to appeal, the

Court is entitled to presume that the defendant stands fairly and finally convicted.

*United States v. Willis*, 273 F.3d 592, 595 (5th Cir. 2001) <u>citing</u> *United States v. Frady*,

456 U.S. 152, 164, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) and *United States v. Shaid*,

937 F.2d 228, 231-32 (5th Cir. 1991).  A defendant can challenge a final conviction, but

---

[1]  The Fifth Circuit found that "although Anderson argues that his appeal waiver is unenforceable, our review of the record shows that the waiver was knowing and voluntary, as he knew that he had the right to appeal and that he was giving up that right by entering into the plea agreement."  *See* docket no. 183, pg. 3 *citing United States v. Bond*, 414 F.3d 542, 544 (5th Cir. 2005).

only on issues of constitutional or jurisdictional magnitude, *Id.* at 595 *citing United States v. Shaid*, 937 F.2d at 232, and must show both "cause" for his procedural default, and "actual prejudice" resulting from the error. *United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998) *citing United States v. Shaid*, 937 F.2d at 232. Other types of error may not be raised under section 2255 unless the Movant demonstrates that the error could not have been raised on direct appeal and, if condoned, would result in a complete miscarriage of justice. *Cervantes*, 132 F.3d at 1109. A fundamental miscarriage of justice is the extraordinary case where a constitutional violation has probably resulted in the conviction of one who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496-7, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986).

Thus, in general, where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in a motion to vacate only if the petitioner can first demonstrate either (1) cause and prejudice, or (2) that he is actually innocent of the crime for which he was convicted. *United States v. Torres*, 163 F.3d 909, 911 (5th Cir. 1999). Section 2255 does not reach errors not of a constitutional or jurisdictional magnitude that could have been reached by direct appeal. *United States v. Seyfert*, 67 F.3d 544, 546 (5th Cir. 1995).

Anderson did file a direct appeal. Anderson cannot show cause and prejudice in this case. Moreover, Anderson makes no claim of actual innocence. As a result, Anderson's §2255 Motion should be denied without a hearing. In an abundance of caution, and without waiving its procedural bar arguments, the United States will address the issues presented.

## STATEMENT OF THE FACTS

According to the PSR and the filed plea agreement, on January 27, 2014, the San Antonio Police Department (SAPD) was conducting surveillance of Anderson before executing a state search warrant of Anderson's residence at 6218 Donely Place, San Antonio, Texas.  In addition to Anderson, Dale Odem Chivers and Ashlea Marie Perkins also live at this residence.  During this surveillance, Officers observed a Cadillac travel to the Main Event parking lot.  At some point, four individuals exited the Cadillac, before the Cadillac left the location with Chivers driving.  Moving surveillance was maintained as the Cadillac drove to 6218 Donely Place.  Chivers parked the vehicle and entered the residence at 6218 Donely Place.  A short time later, another vehicle arrived carrying Anderson and Perkins also arrived at the residence.  Shortly after entering the residence, Perkins and Chivers exited the residence and entered an Infinity G35 bearing dealer plate 10C3446, while Anderson entered the Cadillac.  Both vehicles left the residence.  Moving surveillance was maintained on the Cadillac as it returned to the Main Event parking lot followed by the Infinity.  Surveillance observed Chivers exit the Infinity and enter the Cadillac with Anderson.  While Anderson and Chivers were sitting in the parking lot, surveillance observed several individuals come up to and enter the Cadillac for a very short period of time.  After the perceived drug transactions, surveillance observed Chivers get back into the Infinity and leave the Main Event Parking lot, Anderson exited the Cadillac and went back into the Main Event. Moving surveillance was maintained as Chivers traveled back to the residence at 6218 Donely Place.

At approximately 2200 hours the state narcotics search warrant was executed at

6218 Donely Place.  Three males were located inside the residence.  Chivers and another male were standing around the kitchen table where there was approximately $300.00 in US Currency and several bags of marijuana with an aggregate weight of 65 grams laying on the table.  Both of these individuals were taken into custody.  A third male was discovered hiding in a restroom located near the kitchen.  Surveillance was also maintained on Anderson, Perkins, and the other two females, who stayed at the Main Event.  Anderson, Perkins, and the two females were detained by both plain clothes and uniformed officers at the Main Event.  Investigators observed Perkins attempt to hide her purse which was later discovered to contain approximately 5.7 grams of methamphetamine and $480.00 in US Currency.  All were transported back to 6218 Donely Place where all involved, including Anderson, Chivers, and Perkins, were read the search warrant and their constitutional rights.  All stated that they understood their Miranda rights.

Anderson was escorted upstairs where SAPD conducted an interview.  Anderson was advised of the narcotics investigation and asked where the narcotics in the residence were located.  Anderson stated that all of the narcotics he had were located in the safe in the downstairs living room.  Anderson provided the combination to the safe where approximately 901 grams of methamphetamine and 39 grams of unknown pills were discovered.  This evidence was packaged in many different packages which is the manner in which narcotics are commonly packaged for distribution.  Anderson was asked if he had any US Currency stashed at the residence.  Anderson responded that all of his cash was in Perkins' purse ($480.00) and in the Cadillac he was in earlier in the night.  Officers discovered approximately $14,660.00 in US Currency in the

Cadillac.  A search of Perkins' room, which was attached to Anderson's room, revealed 9.45 grams of methamphetamine packaged in 13 separate Ziploc baggie's, 3.95 grams of marijuana, 27 pills of Adderall and 3 unknown pills all discovered in a small safe, which was unlocked, located in Perkins' room on a shelf.  Also discovered on a shelf near the safe was a Hello Kitty notebook which appeared to be a ledger.  When the search was completed, all involved were transported to the SAPD Gang Office where video recorded interviews were conducted.

Anderson stated that he received approximately two pounds of methamphetamine to distribute every three or four days.  He further stated that he does not have a driver's license and uses both Chivers and Perkins to assist him with picking up money and dropping off narcotics.  Anderson admits that the earlier activities observed by officers in the Main Event parking lot were narcotics transactions where he sold $600 of methamphetamine.  Anderson stated that he knew that Chivers had a black gun in his room.

The amount of methamphetamine that is attributable to Anderson is 1.5kg-5kg of a mixture or substance containing a detectable amount of methamphetamine.

## STATEMENT OF ISSUES

Movant Anderson, in his *pro se* motion to vacate, raises the following issues:  1) that his *Sixth Amendment* rights were violated, specifically that he was denied effective assistance of counsel;  2) that his *Eighth Amendment* rights were violated, when he was held in solitary confinement until he signed a guilty plea; and 3) prosecutorial misconduct.  Anderson listed various reasons comprising these issues.  He stated that the poor performance of his attorneys, as well as, the number of attorneys that

represented Anderson prevented him from receiving adequate and proper representation.  Anderson also stated that the nature of his confinement created mental and physical hardship on his normal decision-making factors, and creates a question of whether his guilty plea was voluntary or knowing.

## ARGUMENT AND AUTHORITIES

### Plea Voluntary or Knowing

A defendant's "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct.1621, 1629, 52 L.Ed.2d 136 (1977).  A defendant ordinarily may not refute his sworn testimony at a plea hearing while under oath.  *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998). Further, official documents, such as a signed plea agreement, are "entitled to a presumption of regularity and are accorded great evidentiary weight." *Hobbs v. Blackburn*, 752 F.2d 1079, 1081 (5th Cir. 1985).

For a guilty plea to be truly voluntary, a defendant must know "what it is he is admitting, so that he does not mistakenly consent to be punished for a crime he did not commit." *United States v. Dayton*, 604 F.2d 931, 935 (5th Cir. 1979).  Rule 11 establishes guidelines that federal courts must follow in order to ensure that a plea is made intelligently and voluntarily.  Before accepting a guilty plea, the district court must address the defendant in person to determine whether the plea is made voluntarily, and that the accused understands the essential elements of the charges and the consequences of the plea.  *McCarthy v. United States*, 394 U.S. 459 (1969) 89 S.Ct. 1166, 22 L.Ed. 2d 418 (1969).  The court must also be satisfied there is a factual basis for the plea and that defendant's conduct constitutes the charged offense.

First, let us examine the plea agreement that Anderson has said he was coerced to sign.  The plea agreement has his signature affixed to page 13.  *See* docket no. 144.  Right above Anderson's signature is a bolded statement that reads "I HAVE READ (OR HAD READ TO ME) THE PLEA AGREEMENT IN ITS ENTIRETY AND AGREE TO THE TERMS SET FORTH IN IT.  ADDITIONALLY, I HAVE READ (OR HAD READ TO ME) THE FACTUAL BASIS CONTAINED HEREIN AND AGREE TO THE FACTS SET FORTH IN THE FACTUAL BASIS."  *See* docket no. 144, pgs. 13-14.  In paragraph four of this plea agreement, Anderson waived his right to appeal and challenge his sentence.  *See* docket no. 144, p. 9.  In this same plea agreement, paragraph five, Anderson acknowledged effective assistance of counsel.  *See* docket no. 144, p. 10.  The paragraph goes on to state:

> The Defendant acknowledges that he has reviewed the merits of the charges and all possible defenses that he may have with his attorney, including, but not limited to, his right to file motions with the Court.  Defendant acknowledges that he has had sufficient time to consult with his attorney on such matters and all possible defenses he may have.  The Defendant further acknowledges by signing this Agreement that he believes he has received effective assistance of counsel, and that he has had sufficient time to consult with his counsel regarding this plea agreement and the punishment that could be imposed.

*See* docket no. 144 p. 10.   The plea agreement alone reveals that Anderson affixed his signature on April 7, 2015 to a document that stated he had an effective defense counsel and that he agreed to the terms in the plea agreement.

Anderson entered a plea of guilty on April 15, 2015, before United States Magistrate Judge Pamela Mathy.  *See* docket entry no. 149.  At the time of his plea, Anderson and his counsel, Edward Camara, Jr, responded to the questions and

admonitions of the Magistrate Judge.  Although Anderson now argues his plea was involuntary because he was confined in solitary confinement and suggests he was not competent, the record demonstrates that at the time of his plea the Magistrate Judge asked Anderson's counsel if there were any doubt as to Anderson's competency, and counsel responded, "No, Your Honor."  *See* docket no. 178, pg. 6.  When asked if he understood the questions asked, Anderson responded that he did and that he understood his counsel when Anderson spoke with him.  *See* docket no. 178, pg. 6.

Additionally, at the time he entered his plea, Anderson indicated that he had a copy of the written plea agreement, and he acknowledged that he had read the agreement "word for word" prior to signing it, and that he had signed it.  *See* docket no. 178, pg. 7.  Anderson also acknowledged that he understood everything in the plea agreement and that the agreement correctly stated his agreement with the Government. *See* docket no. 178, pg. 7-8.

Anderson affirmatively acknowledged that he consented to plead guilty to count one of the indictment against him, and he consented to allow the Magistrate Judge to hear his plea of guilty.  *See* docket no. 178, pgs. 8-9.  Anderson stated that he was pleading guilty to the charge of conspiracy to possess with intent to distribute 500 grams or more of methamphetamine, that he had read over the charge "word for word" and that he knew he could choose to plead not guilty to the charge. *See* docket no. 178, pgs. 11-12.  After the Magistrate Judge asked Anderson how he wished to plead to the charge, Anderson stated, "Guilty, Your Honor."  *See* docket no. 178, pgs. 12.  He then acknowledged he had no questions about any of the proceedings thus far.  *See* docket no. 178, pgs. 12.

Anderson further indicated that he had had sufficient time to talk with his lawyer, to speak with his counsel about the offense to which he was pleading guilty, and that he understood the government was required to prove all the elements of the offense beyond a reasonable doubt before Anderson could be found guilty. *See* docket no. 178, pgs. 13-14. Anderson stated that he understood what the government must prove to show that he is guilty and that he had had sufficient time to talk with his lawyer about the proof required. *See* docket no. 178, pg14. Anderson again acknowledged that he had read over the charge word for word and that the charge described what he had done and the conduct for which he was pleading guilty. *See* docket no. 178, pgs. 14-15.

The Magistrate Judge then reviewed Anderson's rights. *See* docket no. 178, pg. 15. Anderson was advised that he had a right to be represented by an attorney at every stage of the proceedings, that he had a right to a jury trial, and that he had the right to confront witnesses against him and to question witnesses. *See* docket no. 178, pg. 15. He was informed that he had a right to call witnesses and present evidence in his case, if he decided to do so, that he had a right to remain silent, that he was presumed innocent and that the Government bore the burden of proving his guilt beyond a reasonable doubt. *See* docket no. 178, pg. 15. Anderson stated that he understood. *See* docket no. 178, pgs. 15-16.

Anderson was also admonished that he would be giving up all those rights, except representation by counsel, if he entered a plea of guilty. Anderson stated he understood. *See* docket no. 178, pgs. 16-17. Anderson further stated that knowing he would be giving up those rights, he still wished to plead guilty. *See* docket no. 178, pg.

17.  Anderson was advised of the maximum punishment he faced as it was set out on page two of his plea agreement.  *See* docket no. 178, pg. 19.  Anderson stated he understood he faced a mandatory minimum of ten years of imprisonment, a minimum of five years of supervised release, and a $100 mandatory special assessment.  *See* docket no. 178, pg. 19.

The Magistrate Judge advised Anderson how the sentencing guidelines could affect his sentence and the advisory nature of the guidelines.  *See* docket no. 178, pgs. 19-20.  Anderson stated he understood.  *See* docket no. 178, pg. 21.  Anderson also was advised regarding supervised release and stated that he understood.  *See* docket no. 178, pgs. 23-24.

Regarding Anderson's waiver of appeal, the Magistrate Judge advised Anderson that as part of the written plea agreement, he was giving up his right to appeal his sentence or challenge it in any post-conviction proceeding, except in the very limited circumstances set out in the plea agreement.  *See* docket no. 178, pg. 24.  Anderson stated he understood.  *See* docket no. 178, pgs. 24-25.  Anderson further stated that he agreed to give up his rights to appeal and file post-conviction challenges as set out in the plea agreement.  *See* docket no. 178, pg. 25.

Anderson affirmatively agreed that he was pleading guilty freely and voluntarily and with full knowledge of the consequences.  *See* docket no. 178, pg. 25.  He further agreed that no one had threatened him, coerced him or forced him to plead guilty.  *See* docket no. 178, pg. 25.  He stated that no one had promised him anything to induce his guilty plea and that no one had promised him what his sentence would be.  *See* docket no. 178, pgs. 25-26.  Anderson agreed that the facts summarized in the written factual

basis contained within the plea agreement correctly stated what he had done and what he was pleading guilty to and that he had no questions about his plea.  *See* docket no. 178, pgs. 26-27.  Anderson's counsel stated he had no further issues for the court.  *See* docket no. 178, pg. 32.

Additionally, Mr. Camara provided the government with Anderson's written letter to him that details all the questions he had regarding the plea agreement.  *See* Government Attachment D, pgs. 5-6.  In Mr. Camara's sworn affidavit, Mr. Camara stated "[T]he plea bargaining took place over an extended period of time with offers and counter offers thoroughly discussed with Mr. Anderson."  *See* Government Attachment D, pg. 2.  Anderson was fully aware of the contents of his plea agreement as his letter to Mr. Camara revealed.

The Magistrate Judge filed a memorandum and recommendation regarding Anderson's plea, in which the magistrate stated that Anderson was determined to be competent and that the plea was freely, knowingly, and voluntarily made.  *See* docket no. 150.  The district court accepted the magistrate's recommendation, and Anderson did not object to the recommendation.  *See* docket no. 153.

All of these assertions under oath are entitled to great weight.  *Barnes v. United States*, 579 F.2d 364 (5th Cir. 1978).  Anderson knew what he was doing when he entered his guilty plea.  Moreover, Anderson has admitted all the elements of the offense and waived all non-jurisdictional defects in the proceedings leading to conviction when he entered a plea of guilty.  *United States v. Smallwood*, 920 F.2d 1231, 1240 (5th Cir. 1991); *Barrientos v. United States*, 668 F. 2d 838, 842 (5th Cir. 1982).  Furthermore, since a plea of guilty admits all the elements of a formal criminal charge, the defendant

waives all non-jurisdictional defects in the proceedings against him.  *United States v. Diaz*, 733 F.2d 371, 376 (5th Cir. 1984); *Barrientos v. United States*, 668 F. 2d 838, 842 (5th Cir. 1982).

A defendant may waive his statutory right to appeal as part of a valid plea agreement if (1) the waiver is knowing and voluntary, and (2) the waiver "applies to the circumstances at hand, based on the plain language of the agreement."  *United States v. Bond*, 414 F.3d 542, 544 (5th Cir. 2005).  A waiver of appeal is made knowingly and voluntarily when a defendant indicates that he has read and understood the plea agreement, which contains an "explicit, unambiguous waiver of appeal.*"  United States v. Wheaton,* 465 F. A'ppx. 321 (5th Cir. 2012).

Additionally, after a review of the record, the Fifth Circuit ruled that the "waiver was knowing and voluntary, as he knew that he had the right to appeal and that he was giving up that right by entering into the plea agreement."  *See* docket no. 183, pg. 3.  Anderson was fully aware of the agreement he entered into with the government with his signed plea agreement and plea colloquy.  Anderson's argument that his plea was not knowing or voluntary fails.

**Ineffective Assistance of Counsel**

Anderson alleged that he received ineffective assistance of counsel from his court appointed attorneys: Kurt May, Karl Basile, and Edward Camara, Jr.  Anderson states that Mr. Camara provided "sub-standard representation," and urged Anderson to "be quiet about the violation of his constitutional rights," concerning the solitary confinement.  *See* docket no. 187, page 18.  Anderson's sentencing guideline range was 360 months to life.  *See* docket no. 177, pg. 2.  Since the plea agreement only

charged Anderson with a mixture of substance as opposed to an Ice calculation, the sentencing range was reduced to 235 to 293.  *See* docket no. 177, pg. 2.  Anderson was sentenced to 293 months.  *See* docket no. 177, pg. 6.

The two prong analysis which must be applied to ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).  The movant must first demonstrate that his attorney's performance was deficient.  *Id.* at 686.  In order to be deficient, counsel's performance must be "outside the wide range of professionally competent assistance."  *Id.* at 687.  If he succeeds in satisfying the first hurdle, then the movant must also demonstrate that the deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694, *See* also *United States v. Drones*, 218 F.3d 496, 500 (5th Cir. 2000).

The proper standard for attorney performance is that of reasonably effective assistance.  *Strickland v. Washington*, 466 U.S. 668, 693; 104 S.Ct. at 2052 (1984). When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show, considering all the circumstances, that counsel's representation fell below an objective standard of reasonableness.  *Id.* at 688.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  *Id.* at 689. The judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within that wide range of

reasonable professional assistance.  *Id.* at 689.  *See Drones*, 218 F.3d at 500.  Of course, conclusory allegations of ineffective assistance of counsel are not sufficient to raise a constitutional issue. *United States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007); *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000).  In the context of sentencing, the movant must demonstrate a reasonable probability that, but for counsel's errors with respect to sentencing matters, he would have received less time in prison.  *See United States v. Grammas*, 376 F.3d 433, 436-8 (5th Cir. 2004); *Glover v. United States*, 531 U.S. 198, 203, 121 S.Ct. 696.

Mr. Camara was Anderson's third attorney and was court appointed on September 26, 2014.  By April 7, 2015, a signed plea agreement was filed.  The Government would offer Attachment B to this response.  This attachment reveals a sequence of emails between AUSA Wannarka and Defense Counsel Camara.  Mr. Camara was very persuasive in his plea negotiations for his client.  Mr. Camara was instrumental in obtaining an offense level 33 with a guideline range of 235 to 293 months instead of an offense level 36 with a guideline range of 360 months to life.  Mr. Camara also helped Anderson with his release from solitary confinement.  In the attached email, Mr. Camara stated that "the matter could be expedited to a quicker resolution if Anderson were allowed to consult and communicate (on a limited basis) with his family and/or friends about entering a plea."  *See* Government Attachment B, pg. 2.

At the sentencing phase, Mr. Camara filed a Sealed Sentencing Memorandum.  *See* docket no. 161.  In the twelve page document, Mr. Camara meticulously provided the Court with Anderson's life history.  Mr. Camara stated "The circumstances of Mr.

Anderson's early life, although not justification for his criminality, may help explain some of his behavior, and should, as will be set out further in this Sentencing Memorandum, warrant a punishment below the guideline range." *See* docket no. 161, pg. 3.  Mr. Camara not only outlined Anderson's life, he also attached an excerpt from Anderson's Texas Youth Commission (TYC) chronological record dated 9/2/00 and two Psychological Progress Notes from GEO's Medical Dept.  The time and research Mr. Camara spent shows that he was effective.  On the contrary, Mr. Camara aggressively advocated for his client and sought to lower Anderson's sentence by negotiating a plea deal below the sentencing range and by requesting a below the guideline range sentence.

Anderson argued that he had ineffective assistance of counsel.  The record reveals otherwise.  The fact that Mr. Camara negotiated a plea deal that reduced the sentencing guideline of 360 months to life imprisonment to a 293 month sentence revealed *effective* defense counsel.  Furthermore, Movant can show no actual prejudice as a result of counsel's actions since the above claims were meritless, and the failure to raise a legally meritless claim cannot be the basis for a claim of ineffective assistance of counsel. *United States v. Mingo*, No. 10-222, 2014 U.S. Dist. LEXIS 125977 (E.D. La. Sep. 8, 2014) *citing Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990).

Anderson does not meet the two prong analysis of ineffective assistance of counsel.  Anderson does not offer anything contrary to show that but for counsel's errors with respect to sentencing matters, he would have received less time in prison. *See United States v. Grammas*, 376 F.3d 433, 436-8 (5th Cir. 2004); *Glover v. United States*, 531 U.S. 198, 203, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001).  Anderson alleged

no specific facts to support his allegations and fails to explain the way counsel could have achieved a more favorable result by advising him to not take the plea deal.  The District Court Judge in the sentencing hearing was ready to use the punishment range of 360 to life.  *See* docket no. 177, pg. 2.

Mere conclusory statements do not raise a constitutional issue in a habeas case. *Gonzalez v. United States*, No. A-16-CA-1164-SS; 2017 U.S. Dist. LEXIS 13337 (W.D. Tex. Jan 6, 2017) *citing Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982). Conclusory allegations of ineffective assistance do not possess sufficient specificity to satisfy the prejudice prong of the *Strickland* test.  Anderson's argument alleging ineffective assistance of counsel fails.

**Three Court Appointed Attorneys**

It is an undisputed fact that Anderson was assigned three court appointed attorneys throughout his judiciary proceedings.  Anderson argued that "having multiple attorneys" provided him with an inconsistent and ineffective defense.  *See* docket no. 187, pg. 17.

Anderson's first court appointed attorney was Kurt May a Federal Public Defender.  Mr. May was Anderson's attorney for approximately one month.  Mr. May filed a motion to withdraw as Anderson's attorney when he became aware of "a current and ongoing conflict" in representing Anderson.  *See* docket no. 43.

Next, Mr. Karl A. Basile was appointed as defense counsel on February 27, 2014.  In August 25, 2014, Anderson wrote a letter to the court complaining about Mr. Basile and was construed by the court as a *pro-se* motion to appoint new counsel.  *See* docket no. 113.  A hearing was held before Magistrate Judge Bemporad on September

3, 2014.  Judge Bemporad's Order was entered on September 3, 2014.  The Order stated that "At the hearing, Defendant indicated the desire to resolve issues with current counsel and proceed with current counsel at this time."  On September 25, 2014, Mr. Basile filed a Motion to Withdraw as Attorney.  *See* docket no. 118.  Mr. Basile stated that Anderson's latest letter dated September 14, 2014 (See docket no. 122) had damaged the client attorney relationship.  In Anderson's September 14, 2014 letter, he asked the court to appoint him another attorney.

Based on Anderson's request, Mr. Camara was court appointed to Anderson's case on September 26, 2014.  Through the attached emails (see Government Attachment B), Mr. Camara was an aggressive advocate for Anderson.  By April 7, 2015, a signed plea agreement was filed.

The record reveals that Anderson was not prejudiced by having three court appointed advocates.  Anderson merely stated that he was prejudiced.  Anderson does not offer any explanation of the way he was prejudiced.  Anderson again makes mere conclusory statements.   Anderson made the request to terminate his second attorney and have his third attorney appointed.  Anderson's argument that having three different attorneys harmed his defense fails.

## Solitary Confinement

Anderson argues that on March 28, 2014[2], he was suddenly removed from general population and placed into the Segregated Housing Unit (SHU), despite there having been no disciplinary incident prior to his removal.  Anderson stated that "he was

---

[2]  As stated in the PSR, Anderson was in SHU from March 28, 2014 until April 10, 2015.  He was placed in solitary confinement to prevent him from having contact with the co-defendants in this case.  *See* docket no. 160, para. 73, pg. 21.

not allowed to receive visits, make phone calls, or send out or receive any mail while in SHU." *See* docket no. 187, pg. 4.  Anderson stated that the reason given was that he was pending investigation by the U.S. Marshals/AUSA.  *See* docket no. 187, pg. 4.  He then stated that if he did not sign the plea agreement he would stay in the SHU without communication or interaction.  *See* docket no. 187, p. 6.  Now, Anderson argued that he signed the agreement only to end his confinement in the SHU and that he did not know or care what was in the agreement.[3]  Anderson also stated that he did not know the reason he was placed in SHU.  *See* docket no. 187, pg. 24.

"The constitutional rights of a pretrial detainee are found in the procedural and substantive due process guarantees of the *Fourteenth Amendment*."  *Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 462 (5th Cir. 2015).  "The legal standard used to measure the due process rights of pretrial detainees depends on whether the detainee challenges the constitutionality of a condition of his confinement or whether he challenges an episodic act or omission of an individual state official."  *Id.*  "A challenge to a condition of confinement is a challenge to 'general conditions, practices, rules, or restrictions of pretrial confinement."  *Id.* at 463.  To evaluate whether a plaintiff has stated a condition-of-confinement claim, a court "asks whether the condition is 'reasonably related to a legitimate governmental objective.'"  *Id.*  A plaintiff must demonstrate:

> "(1) a rule or restriction or . . . the existence of an identifiable intended condition or practice . . [or] that the jail official's acts or omissions were sufficiently extended or pervasive"; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [a detainee's] constitutional rights.

---

[3]  The Fifth Circuit has already determined that Anderson's plea was knowing and voluntary.

*Id.* at 468. (quoting *Duvall v. Dallas Cnty.*, 631 F.3d 203, 207 (5th Cir. 2011)).

The Government offers an email from AUSA Wannarka to United States

Marshalls Service Deputy McPherson dated December 14, 2014. *See* Government

Attachment A. The AUSA details the reason for Anderson's confinement. The AUSA

also conveyed the same reason to Mr. Camara, defense counsel for Anderson. As

detailed in the email to defense counsel:

> "Anderson was placed under restriction because he was
> directly contacting Ashlea Perkins via his and other inmates
> phones. Ashlea was on bond at the time living with her
> parents. Her parents are good supportive folks. Anderson
> also had people on the outside contact her and her brother.
> Most seriously, Anderson sent people to sit outside the
> Perkins house on a regular basis. Sometimes they would
> approach the house. This caused the parents enormous
> distress. They spent a great deal of money on a security
> system and spent most evenings afraid. As soon as I
> learned Anderson was taking these actions, he was locked
> down. I don't trust him. He fancies himself a player of
> people and likes the power. As long as I can help it, he will
> remain on lock down. I definitely want to keep him on phone
> restriction."

*See* Government Attachment A.

Anderson argued that the confinement violated his constitutional rights.

Anderson stated that the reason for his confinement was a pending investigation. After

Anderson was placed in confinement, the contacts to Ms. Perkins and her family

ceased. The legitimate governmental objective in restricting Anderson's communication

while in custody was to protect Ms. Perkins and her family. Anderson does not

overcome the legal standard in regards to pretrial detainee detention.

In addition, in Anderson's *pro-se* letter to the court on August 25, 2014, five

months after his segregated housing commenced, he made no mention or complaint

about the segregated housing.  Again in his September 14, 2014 letter to the court, Anderson does not mention any deterioration in his mental faculties due to the communications restrictions.  There is no mention of mental anguish caused by the confinement until Anderson stated it in this instant Motion to Vacate.

In the revised Presentence Report (PSR)[4] dated July 9, 2015, paragraph 75 stated that "[W]hile at GEO Facility, he was provided medication for mental health issues, but he discontinued taking because it made him sleepy."  *See* docket no. 160, pg. 21.  Also stated in the PSR, "according to the medical staff at the GEO Facility, Mr. Anderson has refused psychological counseling and medication while incarcerated."  *See* docket no. 160, pg. 21.  In the next paragraph of the PSR, Anderson's medical documentation from the University of Texas Harris County Psychiatric Center in Houston was discussed.  Mr. Anderson committed himself on November 9, 2011.  The PSR stated that during "his stay at this facility, Mr. Anderson was compliant with the mental health treatment and took his medications.  The defendant demonstrated an adequate sleep pattern and appetite, became less irritable, less mania, and overcame his suicidal or homicidal ideations."  *See* docket no. 160, para. 74, pgs. 21-22.  Anderson's refusal to take his medications was the cause of his mental health deterioration.  When he was at the Center in Houston, the record reflected that when he was on his medication, Anderson was stabilized.

---

[4]  Generally, a PSR bears sufficient indicia of reliability to permit the district court to rely on it at sentencing.  The PSR, however, cannot just include statements, in the hope of converting such statements into reliable evidence, without providing any information for the basis of the statement.  Normally, the defendant has the burden to show that the information relied on in a PSR is inaccurate.  The rebuttal evidence presented by the defendant must show that the PSR's information is materially untrue, inaccurate or unreliable. *United States v. Adams*, No. 08-10053, 2009 U.S. App. LEXIS 2175 (5th Cir. 2009) *citing United States v. Taylor*, 277 F.3d 721, 724 (5th Cir. 2001).  Information in the PSR that is unrebutted by the defendant bears sufficient indicia of reliability to be considered evidence by the district court.  *United States v. Roush*, 466 F.3d 380, 388(5th Cir. 2006).

Furthermore, in the two GEO progress notes signed by Dr. Parton, he described Anderson's condition.[5]  Dr. Parton did not seem concerned about Anderson's mental health.  On the contrary, Dr. Parton stated that Anderson seemed to be coping adequately.

Anderson was placed in segregated housing because he was contacting and threatening a co-defendant and her family.  There was a legitimate government objective to protect the Perkins family.  Once he was placed in segregated confinement, the harassment stopped.  Anderson also refused to take his mediations even though he knew that when he was on his medications he was stable.  Anderson's argument that his segregated housing created his mental health hardship, which led him to sign the plea agreement, fails.

## Prosecutorial Misconduct

Anderson can only prevail if he demonstrates that the claim is timely and that the alleged governmental misconduct affected the voluntariness of his plea.  *See United States v. Scruggs*, 691 F.3d 660 (5th Cir. 2012).  Since Anderson did not raise the claim on direct appeal, he also must show cause and prejudice with regard to the default or that he is actually innocent.  *See United States v. Scruggs*, 691 F.3d 660 (5th Cir. 2012) citing *Bousley v. United States*, 523 U.S. 614, 622, 118 S. Ct. 1604 (1998).  Anderson can show neither prejudice or actual innocence.[6]

Anderson states that the AUSA used solitary confinement "for over a year as a

---

[5]  On the progress note dated 1/22/15, Dr. Parton wrote "He appears to be coping adequately and responding appropriately given the situation he is in (segregation and forced isolation from family).  *See* docket no. 161, pg. 11. On the progress note dated 4/9/15, Dr. Parton wrote "Mr. Anderson appears to have a healthy level of insight regarding his future, with realistic expectations of the potential for relationships in the future."  *See* docket no. 161, pg. 12.
[6]  In Anderson's Motion to Vacate, he never once stated that he was innocent.

method by the Government to coerce a guilty plea from him." *See* docket no. 187, pg.

10. Anderson continued and stated that "the confinement was ordered by the

Government without regard to the petitioner's psychiatric conditions or any other factors

that have been known to create extreme coercive pressures on the person being

subjected to these cruel and unusual punishments." *See* docket no. 187, pgs. 10-11.

The record reflects otherwise. In an email transmission from Defense Counsel

Camara to the AUSA, Anderson's attorney clearly stated that Anderson was willing to

enter a plea bargain but had objections to the current proposed plea agreement. *See*

Government Attachment B, pgs. 3-4. Again, there was not one mention of the solitary

confinement. Anderson did not want to waive his appeal rights. The email was dated

February 12, 2015 and the plea agreement was filed on April 7, 2015. Anderson knew

about the waiver and used it as a bargaining chip. Unfortunately, the general policy of

the Government is include an appeal waiver on every plea agreement. The AUSA

responded on February 19, 2015 and stated that she could not change the appeal

language. *See* Government Attachment B, pg. 3. At the top of page three of the same

email attachment dated February 19, 2015, the AUSA informs defense counsel that she

received "a call from the USMS (United States Marshall Service) that Anderson has

stopped taking his high blood pressure medicine and is refusing all medication."

Anderson made the choice to stop his medication.

In another email dated April 1, 2015[7], defense counsel informed the AUSA that

he had been "talking with Mr. Anderson about resolving this matter, and he is nearly

---

[7]  This email was another email but part of the same string of emails. The Government last responded to
defense counsel on February 19, 2015 and this email was dated April 1, 2015. This also reflects the due
diligence of defense counsel advocating for his client.

there." *See* Government Attachment B, pg. 2.  In this email, defense counsel requests:

> "I also think that this matter could be expedited to a quicker
> resolution if Anderson were allowed to consult and
> communicate (on a limited basis) with his family and/or
> friends about entering a plea.  His restricted isolation causes
> him to be much more distrustful of making a decision.
> Whereas if he could get the support of family and friends, he
> would be more agreeable to make the decision necessary to
> resolve the situation.  We all kike to consult with loved ones
> before making important decisions."

*See* Government Attachment B, pg. 2.  The AUSA responded on April 6, 2015 and gave

her final concessions to the plea agreement[8].  The AUSA also stated "I will agree to

allow Anderson to contact family only.  No friends, no co-defendants, no girlfriends.

Only family.  If I found out he contacts anyone other than his own family, I'll have him

sent to Siberia.  (not really, but I'll lock him down again)."[9]  The AUSA clearly stated that

she was still concerned about Anderson's previous behavior of confronting the

codefendant and her family (the reason Anderson was placed in solitary confinement).

Lastly, in an email to the U.S. Marshals dated April 6, 2015, the AUSA stated

> "as part of a good faith effort to get David Anderson to plead,
> I told his defense atty that I will ask you to lift David
> Anderson's restrictions regarding communications.  He
> wants to talk to his family before he signs the plea
> agreement."

*See* Government Attachment C.  The AUSA did as promised to the defense attorney.

She agreed to let Anderson discuss the plea agreement with his family.  Anderson was

ultimately released from segregated housing on April 10, 2015.  See docket no. 160,

para. 73, pg. 21.

---

[8]   The final plea deal was a beneficial deal for Anderson.  The AUSA agreed to remove the ICE amount and instead
hold Anderson liable for a mixture of methamphetamine, She also removed the Felon In Possession of a Firearm
charge.
[9]   In his signed affidavit, Mr. Camara recalls that the "allowance was made prior to entering the plea agreement so
that Mr. Anderson would be able to discuss his situation with his family . . ."  *See* Government Attachment D, pg. 2.

For Anderson to complain that he was coerced by the solitary confinement to sign the plea agreement is outrageous.  Anderson had the choice to sign or go to trial.  Anderson was looking at 360 months to life in prison.  The plea agreement negotiated by his highly effective defense attorney reduced his sentencing range to 235 to 293 months.  Anderson's statement that he felt coerced by the cruel punishment of solitary confinement does not rise to the level of any misconduct.  "To constitute fear and coercion on a plea, petitioner must show he was subjected to threats or promises of illegitimate action" *See United States v. Goodman*, 590 F.2d 705 (8th Cir. 1979).  AUSA Wannarka did agree to allow him to talk about the plea agreement with his family.  There were no threats or coercion, just the truth of the consequences of Anderson's choices.  The defendant's claim of prosecutorial misconduct fails.

## Conclusion

An evidentiary hearing is not automatically granted on every section 2255 motion.  *Robinson v. United States,* No. 4:05-CV-756-Y, 2008 U.S. Dist. LEXIS 90879 (N.D. Tex. Nov. 7, 2008) *citing Coco v. United States*, 569 F.2d 367, 369 (5th Cir. 1978).  Since the issues presented by Movant can be resolved on the basis of the conclusive record in this case, an evidentiary hearing is unnecessary.  *Robinson v. United States*, 2008 U.S. Dist. LEXIS 90879 (N.D. Tex. Nov. 7, 2008) *citing United States v. Drummond*, 910 F.2d 284, 285 (5th Cir. 1990).  Movant's representations to this court are without any foundation and should, therefore, be rejected without a hearing.

Movant Anderson cannot show cause and prejudice to overcome his procedural fault nor does he allege actual innocence.  Wherefore all premises considered, the United States prays that Movant's Motion to Vacate, Set Aside, or Correct Sentence be

in all things denied.

Respectfully Submitted,

RICHARD L. DURBIN, Jr.
United State Attorney

_____/s/_____
SARAH WANNARKA
Assistant United States Attorney
State Bar No. 24013710
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
Tel: (210) 384-7150
Fax: (210) 384-7118

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the **26th day of November, 2017** a true and correct copy of the foregoing Government's Response to Motion to Vacate, Set Aside or Correct Sentence was electronically filed with the Clerk of the Court using the CM/ECF System and that a true and correct copy has been mailed to the non-CM/ECF participant, pro-se movant,

_____/s/_____
SARAH WANNARKA
Assistant United States Attorney

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DAVID LEE ANDERSON, | § | |
| | § | |
| Defendant-Movant, | § | |
| v. | § | CIVIL NO:  SA-17-CA-901-OG |
| | § | CRIMINAL NO:  SA-14-CR-0123-OLG |
| UNITED STATES OF AMERICA | § | |
| | § | |
| Plaintiff-Respondent. | § | |

## <u>ORDER</u>

On this date came on to be considered Movant's Motion to Vacate, Set Aside, or

Correct Sentence Pursuant to Title 28 U.S.C. § 2255, the Government's response thereto,

as well as the entire record.  After careful consideration, it is determined by the Court that

the Title 28 U.S.C. § 2255 motion should be in all things DENIED.

SIGNED this ____ day of _____, 2017.

_____
HONORABLE CHIEF JUDGE ORLANDO GARCIA
UNITED STATES DISTRICT JUDGE
WESTERN DISTRICT OF TEXAS